MaddeN, Judge,
delivered the opinion of the court:
Plaintiffs are three corporations belonging to one group-known to the air transportation industry as the Boeing, or United, group. They are called “United” in this opinion. These three companies, or their predecessors, held, on February 19,1934, five separate “route certificates,” or authorizations to carry air mail for the United States for compensation. Pacific Air Transport had a certificate for route 8,.. *768 from Seattle to San Diego. Boeing Air Transport had a certificate for route 18, from Chicago to San Francisco, and one for route 5, from Salt Lake City to Seattle. National Air Transport, Inc., had two certificates, one for route 17, from New York to Chicago, and one for route 8, from Chicago to Dallas. Effective on February 19,1934, the Postmaster General, acting for the defendant, canceled these certificates, as well as all other then outstanding route certificates held by •other carriers for the carrying of air mail, and refused to give further mail to any of the certificate holders to carry. For some weeks the United States Army carried the air mail in its planes. Then the routes were advertised for bids, the advertisement disqualifying any company from bidding whose route certificate had been canceled, as plaintiffs’ had been.
The United group to which plaintiffs belonged had in it a management corporation, called United Air Lines, Inc., which had not been a holder of one of the canceled certificates and which was therefore not disqualified to bid, and which did bid successfully for four out of the five routes formerly flown by plaintiff companies. Pursuant to these bids, the defendant made contracts, later extended, with United Air Lines, Inc., for flying the mail for periods extending beyond April 5,1936, the date of termination written in the canceled route certificates. Plaintiff companies then turned over to United Air Lines, Inc., the equipment which they had been flying over these routes, and beginning on May 8, 1934, it carried passengers, express, and mail as plaintiffs had done. But, though plaintiffs concede that payments to United Air Lines, Inc., were, in substance, payments to plaintiffs, yet they claim that these payments were less than what plaintiffs would have received under the canceled route certificates. Plaintiffs are suing for the difference. They are also suing for pay earned before February 19, 1934, the date on which they ceased carrying air mail, but never paid them, and for pay from February 19 to May 8,1934, the date on which Air Lines, Inc., began to carry the mail.
As to one of the routes flown by one of plaintiffs before cancellation, route 3, from Chicago to Dallas, Air Lines, Inc., was not the successful bidder for the new air mail contract on *769 that route, and National Air Transport, predecessor of plaintiff United Air Lines Transport Corporation, which had before the cancellation been flying it, soon abandoned it. The planes and other movables were transferred to other uses by the United group of companies. Plaintiff, United Air Lines Transport Corporation, seeks damages for the loss of the value of hangars in Kansas City and Dallas, as well as for the loss of compensation from February 20 to May 12,1934.
The Postmaster General based his cancellation order of February 9, 1934, effective February 19, 1934, upon Section 3950 of the Revised Statutes and upon his general powers as Postmaster General. Section 3950 is as follows:
No contract for carrying the mail shall be made with any person who has entered, or proposed to enter, into any combination to prevent the making of any bid for carrying the mail, or who has made any agreement, or given or performed, or promised to give or perform, any consideration whatever to induce any other person not to bid for any such contract; and if any person so offending is a contractor for carrying the mail, his contract may be annulled; and for the first offense the person so offending shall be disqualified to contract for carrying the mail for five years, and for the second offense shall be forever disqualified.
Plaintiffs assort in these suits that they were not guilty of a violation of Section 3950 of the Revised Statutes, nor were they guilty of any other conduct which-justified the cancellation; that the route certificates were contracts which the defendant breached by the cancellation; and that plaintiffs are entitled to damages for the breach.
The defendant asserts that plaintiffs did violate R. S. 3950, and were guilty of other corrupt and unlawful conduct which justified the defendant in cancelling the route certificates; that in any event the certificates were not contracts, and imposed no legal obligations upon the defendant upon which a claim for damages for breach can be predicated; that if the certificates were contracts, plaintiffs can, under Section 1846 of the Postal Rules and Regulations, recover only a month’s pay. The defendant also asserts counterclaims against plaintiffs for large amounts for alleged overpayments made to plaintiffs during the several years before cancellation. *770 These counterclaims are discussed at the end of this opinion.
.The story of the events leading up to the February 1984 cancellation may be summarized as follows:
For some years before 1916 the Post Office Department and others had been requesting Congress to make funds available for an air-mail service. In 1916 Congress did so, but when the Department advertised for bills, none was received. In 1918 an air-mail service between New York City and Washington, D. C., was established, the Army operating the planes. A few months later the Post Office Department took over the operation, and provided air-mail service until 1927, adding new routes up to a total of 5,551 miles. The Department hoped to demonstrate the feasibility of flying for the carrying of mail and for other purposes, and to get private enterprisers to carry air mail under contracts. Even before 1927 some of the service had been contracted for with private carriers.
In 1925 Congress passed “An Act to encourage commercial aviation and to authorize the Postmaster General to contract for air-mail service” (43 Stat. 805). In 1925 the Post Office Department advertised for bids and awarded contracts for the carriage of air mail, including two of the five contracts later, converted into route certificates involved in these cases. Another of the route certificates here involved originated in a contract made in 1926 and the other two in contracts made in 1927. Each of these five contracts was awarded as a result of competitive bidding.
The Act of 1925 provided for compensating the carrier by giving him an agreed percentage, not to exceed four-fifths,, of the postage received by the Government for the mail carried. By an amendment of 1926 (44 Stat. 692) compensation was to be computed on an agreed basis per pound-mile. A further amendment in 1928 (45 Stat. 594) was known as the “Kelly Amendment.” It provided that an air mail carrier who had given satisfactory service for a period of two years or more might, upon the surrender of his contract, be given a “route certificate” which would authorize him to carry air mail over the route for a total period of- not to exceed ten years from the time he began to carry air mail under his contract. The purpose expressed by the Committee of the. *771 House of Representatives which presented the amendment was to give air mail contractors a longer tenure in view of the large investments which they had to make to equip themselves to carry air mail. The amendment provided that the holder of the certificate “shall have the right of carriage of air mail over the route set out in the certificate so long as he complies with such rules, regulations, and orders as shall from time to time be issued by the Postmaster General for meeting the needs of the Postal Service and adjusting-air mail operations to the advances in the art of flying.” It provided that the certificate might be canceled at any time for willful neglect to carry out such regulations, with sixty days’ written notice of intended cancellation and an opportunity to answer given. It provided that compensation should be determined by periodic negotiation between the holder of the certificate and the Postmaster General but should never exceed the rate set in the surrendered contract.
On August 1, 1928, the then Postmaster General reduced the postage rate on air mail substantially, which greatly increased the amount of such mail, for which air mail carriers were being paid at an agreed rate per pound-mile.
Although several air mail routes, including two of those involved in these cases, had operated under contract for at least two years and thus were eligible for route certificates under the Kelly Amendment, no route certificates were granted by the then Postmaster General up to the time he left the office on March 4, 1929. On that date Walter F„ Brown became Postmaster General. He took a great interest in air mail. He thought, and early expressed to air mail operators the thought, that the service was costing the Government too much. He thought that a space-mileage, instead of a poundage, basis of payment should be adopted, i. e., that compensation should be based upon a specified amount of space available in the plane rather than upon the pounds of mail actually carried on a particular trip. He thought that air mail carriers should carry passengers and express, so that as those parts of the business increased, the cost to the Government of carrying air mail could be reduced. He consulted and corresponded with air mail carriers and with passenger carriers about the problems of the service. He *772 formed the opinion that the route certificates authorized by the Kelly Amendment, which could be modified only if the carrier consented and which did not permit a raise in rates, even if the contract rates should prove to be too low, did not give the Department sufficient control over rates and service.
Brown desired to foster the development of commercial aviation, and to use the air mail and its compensation for that purpose. He thought that the Department should have the power to compel air mail carriers to provide facilities for passengers, which most of them were at that time unwilling to do. He wanted to be able to give air mail and the accompanying pay to passenger carriers who were not able to make both ends meet in their passenger operations. He thought the existing air mail “map” was illogical, and that because of political and community pressure the service was, in some places, expensive to the Government and unnecessary. He thought that consolidations and extensions could be wisely made which would improve the service and reduce the cost.
Brown expressed his views to Committees of Congress, and was asked by members of the Appropriations Committee of the House of Representatives to draft a bill embodying his recommendations. In consultation with representatives of the carriers, he drafted H. R. 9500, which was introduced in the House of Representatives on February 4, 1930. Its text is given in Finding 67. That bill embodied the views indicated above, and in Section 4 contained this language: “* * * when in his [the Postmaster General’s] opinion the public interests shall so require, he may award such contracts by negotiation and without advertising for or considering bids.” Brown desired to have this provision in the statute for the reason inter alia that he wished to be able, in awarding air mail contracts, to take into consideration the “equities” which, in his opinion, passenger carriers who had pioneered when the business was unprofitable, had acquired in the areas where they had operated.
Brown and others from his Department appeared before the House Committee on Post Offices and Post Roads in support of the bill. He pointed out that the privilege of awarding contracts without competitive bidding was unusual, but *773 gave reasons for and urged its adoption. Representatives of air mail and passenger-carrying lines, including these plaintiffs, also appeared to urge the adoption of H. R. 9500. March 24,1930, the Committee reported the bill favorably, without substantial change. Two members of the Committee filed a minority report opposing the bill because it permitted the award of contracts without competitive bidding. Speaker Longworth advised Brown that he thought the bill could not be passed without amendment to meet this opposition. The bill was amended, passed, and signed by the President on April 29, 1930 (46 Stat. 259). It became known as the Mc-Nary-Watres Act, or the Watres Act. Its text is reproduced in Finding 71. It omitted the discretion relating to competitive bidding and the provision for giving consideration to the equities of air mail and other aircraft operators in the awarding of air mail contracts. At the request of Brown, there was inserted in Section 6 the words “and passenger transportation,” thus empowering the Postmaster General to require a carrier, in order to obtain and retain an air mail route certificate, to provide such facilities for carrying passengers as the Postmaster General might prescribe.
Brown had up to this time issued no route certificates under the Kelly Act because of his hope of obtaining the new and more satisfactory legislation. When some of the four-year contracts let in 1925 and 1926, including three of the contracts here involved, were about to run out, he extended them for six months hoping that before the end of that time the new legislation would be enacted. Again in April, 1930, some of the extensions were about to expire, and the Department advertised for bids for contracts for two months’ periods, reserving the right to withdraw the advertisements if the pending air mail legislation was enacted before May 5. As we have seen, the legislation was approved by the President on April 29. No contracts were therefore awarded, but route certificates were issued under the provisions of the Watres Act on May 3, two of them being to plaintiffs. When the advertisements just mentioned were published, Brown sent word to plaintiffs who were holders of the expiring contracts that the advertisement was not an unfriendly act, apparently meaning thereby that he thought that the two- *774 month term offered was so short that it would not attract any competitive bidders.
After the Watres Act became law, there was much discussion among Department officials, including Brown, and representatives of air carriers, as to what coidcl be done under the act to further the purposes which Brown had expressed while the legislation was pending and before. Many questions were asked, particularly as to whether the Postmaster General could recognize the “equities” of passenger-carrying pioneer lines who had not had air mail contracts. Many requests for such assistance were made. It was suggested to the Postmaster General that a passenger carrier could be given air mail by the process of making a geographical extension to an existing route, with the understanding that the extension would be assigned or sublet to a carrier who had an “equity” in the territory.
On May 15, some two weeks after the Watres Act was approved, Brown instructed the Second Assistant Postmaster General, W. Irving Glover, to invite certain air mail and passenger-carrying operators to a conference with Brown on May 19, at the Department. The operators specified were the principal ones in the industry, and included plaintiffs’ group. The conference met on May 19. Brown, Glover, and Earl W. Wadsworth, Superintendent of Air Mail in the Department, were there. Some twenty-five individuals, representing all the large operators in the industry, including plaintiffs, and a number of smaller ones, were there. Some cáme who had not been invited but had heard of the meeting from ones who were invited. Wadsworth made some shorthand notes, though not a complete record, of what was said at the opening session of the conference. His transcript of those notes is in Finding 78. It contains the following-statement concerning what the Postmaster General said:
The Postmaster General opened the meeting by discussing the general provisions of the Watres Bill and invited suggestions from those present as to the ways and means of assisting the passenger operators, inasmuch as it is understood none of the so-called strictly passenger lines are breaking even and it is apparent that they will need some assistance if they are to continue. The P. M. G. expressed the desire to know *775 whether it is going to be possible for the so-called pioneers to agree among themselves as to the territory in which they shall have the paramount interest. Pie outlined certain prospective routes that were in contemplation somewhat as follows: a Southern Transcontinental route from Los Angeles to San Diego, thence to Fort Worth and Dallas; also a route from New York to St. Louis and Kansas City and Los Angeles; from St. Louis to Tulsa and Fort Worth; from St. Paul to Winnipeg; possibly from St. Paul and Minneapolis to Omaha; possibly a route south from Cheyenne, and possibly one from Albany to Boston. He referred to the plan mentioned below.
Brown also said to the conference that he was disappointed when the Watres Act failed to give him the right to let contracts without competitive bidding, but that a further study of the act as adopted had persuaded him that a liberal interpretation of his power to consolidate and extend existing or later established air mail routes could accomplish some of the same purposes, if he could arrange that those who received the extensions should sublet them to passenger carriers who did not have air mail contracts. He said that he wanted one or more transcontinental lines in addition to the one that then existed, and that each of them should be independent and competitive. He said he hoped they would work out mergers and consolidations which would enable long lines to be operated by single operators, but with due regard to the equities of those who had built up the parts of those lines. He made it plain to those present that he was asking only for suggestions and recommendations but that the decision as to what would be done was for him to make.
The Wadsworth minutes show that several of the persons present spoke, and their remarks show that they were thinking of the conference as a way of attempting to divide up the business, pursuant to the Postmaster General’s suggestion, on an agreed basis based upon their “equities” in the situation, and of thus avoiding competitive bidding.
Mr. William P. MacCracken, a former Assistant Secretary of Commerce (for Air) and then a lawyer representing important companies, including Transcontinental Air Transport, suggested “grouping the representatives together according to locality, in order to work out the details of the *776 plan, or any other plan that might be gotten up, suggesting they might even have four committees, or an eastern and a western committee.”
Brown invited the meeting to use the room they were in, which-adjoined his office, for their further deliberations and suggested that they form a committee. He then left the meeting, as did Glover and Wadsworth. The Department on the same day issued a press release announcing the conference. Its text appears in Finding 78.
The meeting continued and MacCracken was elected chairman. Several important officials of plaintiffs’ group, including Col. Paul Henderson, were present. Brown had brought to the meeting a map showing twelve routes which he desired to establish. The chairman named each route and asked those present to indicate whether they claimed interests in that route. Nearly every operator present claimed an interest in the route from Los Angeles to New York, via Kansas City, St. Louis, Columbus, and Pittsburgh. There were several claimants for each of the important routes. Plaintiffs’ group, under the name “United” appears on MacCracken’s notes as a claimant on seven of the twelve routes when the first call was made.
United did not desire the establishment of most of the new routes proposed by the Postmaster General, since it already had the only existing transcontinental route, from New York via Chicago to San Francisco, as well as other valuable routes, and mail would be diverted from those routes if the proposed new ones were established. All' these claims of United, except the one for No. 12 from Seattle to Vancouver, were withdrawn later in the conferences by Henderson on the instruction of his superior, Philip G. Johnson. The conferences went on, principally at places in Washington other than the Department, until June 4. United representatives were not present at most of these outside meetings but they remained in Washington and kept in close touch with the conferences for the purpose of protecting United’s interests. They reconciled themselves to the Postmaster General’s determination to establish the new routes, and desired not to antagonize him.
On June 4,1930, the conferees met.again in the Post Office Department and reported to the Postmaster General (Find *777 ing 90) tliat agreement had been reached on seven of the twelve routes, “while as to the remaining five there are still some matters in controversy”. Among the five were the two proposed new transcontinental routes. This report appears in full in Finding 90. The report shows inter alia that during the negotiations United had offered to give up its contract on its line south of Kansas City in exchange for “some other line of equal value”, in order to facilitate the purposes of the conference.
When the report was submitted, the Postmaster General expressed disappointment that no agreement had been reached on the really controversial questions. The group then said they would file a supplemental report which they did later on the same day. It said:
The Committee has instructed me to advise you that the representatives of all of the parties involved in _the-controversies desire to submit these controversies to you as arbiter and agree to be bound by your decision.
The meetings of the May 19-June 4 period were devoted to the question of how to evade the McNary-Watres Act. The purpose of that Act, so far as it concerned competitive-bidding, was well known to the principal operators present,, including Henderson, plaintiffs’ spokesman at the meeting. They had urged the enactment of H. K. 9500, of which the-power to award contracts without competitive bidding was one of the principal objects. They knew that the House of Kepresentatives had pointedly refused to grant that power.. At the opening of the May 19 meeting Brown, as we have said, had reminded them of his disappointment that H. B. 9500 had not been enacted and had expressed his hope of aivarding contracts by the processes of extension and subletting under a “liberal” construction of the Watres Act. Both Brown and the conferees understood that the purpose of resorting to these processes would be to avoid competitive bidding.
While the word “extension” is necessarily indefinite in meaning, its purpose could not possibly cover such a circuitous performance as Brown here suggested and, as we shall see,, later carried out. The power to promote the public.convenience and economy by adding a segment to an air mail *778 line, so that there could be continuity in its service and the facilities already existing over the rest of the line could be used in its service, was the obvious purpose of the power to grant extensions. To grant an extension to an existing line flown by A, with the understanding that the extension was to be immediately sublet to B who would fly the extension and receive the pay for it, is the opposite of that purpose. Such a device could not have any other purpose so far as these conferees were concerned than that of awarding an air mail contract to B without his having to obtain it by competitive bidding. In the instances in which the device was used, it was used for that purpose only.
This, then, was one of the devices which had been suggested to the Postmaster General before the meeting, and which he proposed to the meeting. The remarks of plaintiffs’ representative, Henderson, who spoke first in response to the Postmaster General’s opening statement at the meeting, were noted in the Wadsworth minutes as follows:
“I believe it is quite possible for this group to work out a plan.” He asked for instructions from the P. M. G. as to some policy. He mentioned extensions and then assigning such extensions to some operator who has no air-mail contract. He indicated the air-mai'l contractors would be willing to agree to such a plan.
We think that, to whatever extent the operators agreed to this device, at the meetings or thereafter, they made a combination to avoid competitive bidding. As we shall see, they did agree, and carried out their agreement to have contracts awarded by this device, whenever the Postmaster General requested them to do so.
We further think that the principal conferees, including plaintiffs, in the conferences, and in the reports showing the allocation of the seven lines and the submission to the Postmaster General of the determination as to the five lines, and by their conduct thereafter agreed with each other and with Brown that each would make no claim for, or attempt to obtain the right to carry air mail over one of those lines unless he was the one named in the allocation or selected by the Postmaster General. While the thinking of the conferees during the conference may have been largely along the line *779 of the contracts being awarded by extensions rather than on bids following advertisements, it was never expressly so limited, and the principal conferees, including plaintiffs, always conducted themselves thereafter as if their agreements applied to contracts awarded after advertisement for bids as well as to contracts awarded by extension. The agreement was scrupulously followed by all the principal parties, including plaintiffs.
The parties understood that these agreements were not binding upon the Postmaster General. That is, of course, immaterial. Nor is it material that Brown consented to the agreements, or urged them upon the group, and in large measure dictated the performance of them at later stages. R. S. 3950 makes no exception of a combination or agreement consented to or instigated by a public officer.
As to the events following the conference, they were, in brief, as follows:
When Brown received the conference report on June 4, he told his associates in the Department that he would submit to the Comptroller General the question of how far the Department could go in granting extensions of existing routes. On July 9, 1930, he submitted the following problem: Northwest Airways, Inc. was operating an air mail route between Chicago and Minneapolis, a distance of 694 miles. Could the Postmaster General lawfully extend it from Minneapolis via Grand Forks to Winnipeg, 445 miles, and from Minneapolis via Sioux Falls to Omaha, 340 miles? On July 24 the Comptroller General ruled that the extension to Winnipeg might be justified, but that the one to Ornaba would not be. His letter appears in Finding 92.
Some time between June 4 and the end of July, 1930, the Postmaster General determined to advertise for bids on the middle transcontinental route from New York to Los Angeles and the southern transcontinental route from Atlanta to Los Angeles, and not to attempt to build these routes by extensions. He indicated to the Aviation Corporation, which had an air mail contract from New York to Atlanta, that he wanted it, as the strongest of the interested companies, to operate the southern transcontinental and to take care of the “equities” of other operators who had been carrying passen *780 gers and, in some cases, mail, between some towns along the route, by buying them out or absorbing them. It will be remembered that this was one of the five routes whose disposition was submitted to the Postmaster General at the May-June conference and that at the first session of the conference, Western Air Express, Eastern Air Transport, and •Southwest Air Fast Express, Inc. (Erie P. Halliburton) had made claims for consideration on this route (Finding 86).
Aviation Corporation, as is shown in Finding 94, made an •agreement with Delta Air Lines, which had been operating between Atlanta and Dallas, the effect of which was that it would buy Delta out if it, Aviation, was the successful bidder for the transcontinental route. Aviation also made an .agreement with Western Air Express, which was operating west of Dallas, whereby Aviation’s stock in Western Air Express would be transferred to a new corporation, Transcontinental and Western Air, Inc., which was to be formed to operate the middle transcontinental route, and Aviation would acquire Western’s facilities, located on the southern route, again if Aviation was the successful bidder on the •southern route. As to a third operator on a part of the ■southern route, Southwest Air Fast Express, Inc., whose President, Halliburton, was a persistent and vigorous claimant for an air-mail contract, Aviation agreed with Southwest that Aviation, through a subsidiary which had the requisite night-flying experience prescribed in the advertisement for bids, and Southwest would submit a joint bid for the southern route, and, if their bid was successful, would form an ■operating company, one-half of whose stock would be owned by each; and that Aviation should have an option for a •specified time on Southwest’s stock in the operating company. Some of Southwest’s hangars and facilities were located on the middle route, and Aviation made an agreement with Transcontinental and Western Air, which was being formed to bid on the central route, whereby the latter would buy these facilities, if Aviation Company obtained the •contract on the southern route.
On August 1,1980, Aviation sent a telegram to Wadsworth, Superintendent of Air Mails, saying: “We are satisfied to have advertisement published tomorrow”. The advertisement was published August 2. Aviation, which, through its *781 nominees, was the only bidder, bid 100 percent of the maximum rate, was awarded the contract, and the various conditional agreements mentioned above were carried out.
Aviation was in its conduct described above obeying the directions of Brown and arranging for the elimination of competitors. When the process of elimination was complete, it advised Brown and a pretense of advertising for competitive bids was made. Aviation felt safe in bidding 100 percent of the possible maximum because the other large operators, including plaintiffs, had agreed to leave the disposition of this route to Brown, who had selected Aviation for it, and because it knew that plaintiffs, already having the New York-Chicago-San Francisco route, and Transcontinental Air Transport and Western Air Express, who were known to be about to receive the middle transcontinental route, were forbidden to bid by Brown’s doctrine, which had no legal basis, that each of the three transcontinental routes must be separately owned.
We consider next the middle transcontinental route, New York to Los Angeles via Pittsburgh, Columbus, St. Louis, and Albuquerque. At the May-June, conference, United, i. e. plaintiff’s group, and Transcontinental Air Transport, at first made'claims for consideration on the route. Several other companies, including Aviation, Western Air Express, and Southwest Air Fast Express, made claims for one or the other half of the route. Henderson, after two or three of the meetings, and after consultation with his superior, Johnson, withdrew plaintiffs’ claim to this and to most of the other proposed routes.
Transcontinental Air Transport had been operating a passenger service over this middle route, using the railroads by night and planes by day. Western Air had been operating passenger planes from Los Angeles to Kansas City. Both these companies were strong financially. Brown advised these companies that if they would form a combination to operate the route as a single unit, he would give them the air mail contract. Sheaffer, of T. A. T., reported to his executive committee on July 15, as follows:
The Postmaster General having indicated that he could and would arrange so that an air mail contract award would be properly made to the central transcon *782 tinental providing the two companies organized for the operation of the service, T. A. T. got together with the Western Air Express on a plan to form an operating company, on the following- basis, namely:
This report was, it will be remembered, made nine days before the Comptroller General’s Winnipeg decision of July 24, putting limits on the process of extensions. Brown, however, testified that he did not at any time think that he could create the middle transcontinental route by the extension process, so he apparently intended to award the contract after following the forms of competitive bidding. The two companies agreed to form a new company, Transcontinental and. Western Air, each taking 47% percent of its stock and awarding 5 percent to Pittsburgh Aviation, which claimed some interest along the route in the Pittsburgh area.
When it was learned that bids were to be taken for the middle route, a Mr. Letson, President of United States Airways, Inc., which had a passenger piano operation between Kansas City and Denver, and Lad been trying to get an air mail operation for that route, became interested. He promoted the formation of a new company, United Avigation, Inc., in which his company, along with Pittsburgh Airways, Inc. and Ohio Air Transport, joined. Outside capital was promised and an oral option was secured on planes. The sole purpose of Avigation being to bid for and, if successful in the bidding, to operate the middle transcontinental route, it was agreed that Avigation would be dissolved if the contract was not obtained. In that respect it resembled the various contingent arrangements made by Aviation in preparation for bidding on the southern route.
The formation of Avigation aroused Transcontinental Air Transport. It will be remembered that Holland, an old friend of Henderson, had been taken to the May conferences by Henderson, and had stated there that he represented the United States Airways, Inc., Letson’s line from Kansas City to Denver, though he really had only a civic interest in it. He had then notified Letson of the meetings, given him a note of introduction to MacCracken who was presiding over the meetings, and Letson had, after the first two days, par- *783 ticipatecl in them. When Sheaffer, of Transcontinental Ajir Transport, learned that Letson was forming a company to bid on the middle transcontinental route he telephoned Holland. Holland testified about the conversation that Sheaffer said infer alia,: “Lou, what kind of a fellow is this fellow Let-son that you sent in that meeting? * * * Well he is certainly raising the devil over here.” Holland understood Sheaffer to mean by his conversation that Letson “had organized or was attempting lo organize a company to bid on some of these contracts, ]>utting this company in after the recommendations went in.” Holland, apparently feeling a sense of guilt at having introduced Letson into the May conference, telephoned Letson, reminded him that he had injected Letson into the picture, told him that his attitude was entirely wrong. Letson testified: “It was his idea that I was violating something that I did not understand, and I could not sec that I was violating anything. I thought I had a perfect right to b'd on this contract * * Letson testified t bout Holland’s call as follows:
Well, lie told me plenty. He told me that it was not the Postmaster General speaking but it was the same thing and that if I went on with the organization of Avigation Corporation that I was just out of the air mail business, I never would get an air mail contract and neither would the company that I represented, * * *.
Sheaffer of T. A. T. (Transcontinental Air Transport) thus made it plain that he regarded Letson’s preparation to bid when T. A. T. and Western Air had been selected by the Postmaster General for the route, as a breach of the conference agreement and not ilie conduct of a gentleman.
MacCracken, counsel for T. A. T., submitted written suggestions to the Department as to the requirements to be put into the advertisement for bids. One of these, which caused much subsequent controversy, was a requirement that a bidder, to qualify, must have had at least six months experience in operating aircraft on regular night schedules over a route 250 miles or more in length. There was also a provision that “in the event a bid is submitted jointly by two companies, the experience of either company, or both, will be acceptable insofar as the requirements of the advertisements *784 are concerned.” These suggestions were accepted by the Department and the advertisement was rewritten to include them. The night flying experience would disqualify Avigation. T. A. T. could not qualify under it, but Western Air could, so their joint bid would meet the requirement.
The advertisement was published on August 2, 1930, the bids to be filed by and opened on August 25. Two bids were filed, one the joint bid of T. A. T. and Western Air, and the other that of Avigation. The joint bid was for 97% percent of the maximum rate permitted' by the statute, and A vigation’s bid was for 64 percent. As soon as the bids were opened, Hinshaw, of Aviation, the sole bidder on the southern route, and Henderson, representative of plaintiffs, asked Let-son for a conference and met with him at his hotel. There Henderson told Letson that they had come to talk about the bid, that Avigation had bid too low, and that it could not carry out the contract for the rate it had bid. Letson’s testimony of Henderson’s statement is “We [Avigation] were going to lose a lot of money and we ought to get together on that deal * * The conference broke up shortly because of a quarrel between Henderson and Adams, an associate of Letson, as to whether reports made by air mail operators to the Government as to the costs of operation were truthful or not. Letson regretted Adams belligerent attitude because it prevented him from learning what Henderson and Hinshaw’s proposition was.
Henderson offered no explanation of this visit and was not questioned about it by plaintiffs’ counsel. It could have had no other purpose than, by persuasion, or compromise, to cause Letson to withdraw or modify the only bid for the middle transcontinental route which stood between the high bidder, who was the Postmaster General’s choice, and the contract. United and Aviation were serving their own 'interests, and the interests of the combination, by attempting to eliminate the only real threat of competitive bidding that was allowed to spring up during the entire administration of Brown, under a statute which had pointedly refused him the power to award contracts without competitive bidding, except by extension of existing routes. Henderson’s interest, on behalf of plaintiffs, in eliminating from the field such *785 operators as Avigation, is shown by a letter which he had written on June 26 to Johnson, his superior, saying, inter alia:
Strange as it may seem, it looks as though the PMG can get by the Comptroller General with this plan of his. After all, if he can and does, I think probably it is the best thing that could happen. It will stabilize prices and stop much of this milling around that has been going on, and will make our rates on the New York-Chicago and Chicago-San Francisco lines less a target for criticism than they might be if they had to be compared to ridiculous rates which would of course result from bidding.
Avigation’s bid of 64 percent was 25.6 cents per mile. Aviation, on the southern route, had bid 100 percent of 40 cents, and before the contract was written persuaded Brown to increase the rate to 75 cents, though the anticipated and later realized amount of mail was less than on the middle route. Plaintiffs were, at this time, receiving 65 cents per mile on their Seattle to Los Angeles route for the same reserved space, 25 cubic feet, and on their other routes, with larger reserved space, the correspondingly higher figures shown in the table given in Finding 109.
In the Department, Mr. Coleman, Acting Postmaster General in the absence of Brown, asked John Lord O’Brian,. Acting Attorney General, for an opinion on the legality of the night flying requirement in the advertisement and was advised that it was illegal. Glover, Second Assistant Postmaster General, who had participated in the May-June conference, instructed Gove to line up all the failings in the bids and wire him what he found wrong with them “especially Avigation,” and directing him not to accept any “strengthing documents” to the bids. This did not prevent the Department from accepting a brief from MacCracken on behalf of' the joint bidders attacking Avigation’s bid.
W. G. Skelly, of Tulsa, Oklahoma, a heavy stockholder in Letson’s United States Airways, wrote Letson on August 21 at Kansas City, saying that he (Skelly) had been in Washington for a week and in constant touch with the Postmaster General and representatives of most of the big air lines, and advising Letson, on the basis of his Washington conversa *786 tions, that Letson should stand aside until the transcontinental contract was let—
* * * and then when contracts on contributory lines came up, you would be in a splendid position to get favorable consideration.
I know that the Post Office Department and other interests feel very kindly disposed toward the United States Airways and that you will get very favorable consideration.
This letter was not received by Letson until after he filed his bid, he having left Kansas City before it arrived. He testified that he probably would not have filed the Avigation bid if he had received it before filing.
Though the contract was not awarded to Letson’s competitors for more than a month after the bids were opened, Let-son was convinced, by September 11, that he would not get the contract even if the night flying requirement were held to be illegal. He did not, hoAvever, withdraw his bid, though he forbade his associates in Avigation to continue to attempt to get political assistance for Avigation’s bid. He desired to get Avigation dissolved and to get back to Kansas City without further jeopardizing his chances of getting an air mail contract by extension and subletting for his Kansas City-Denver line.
On October 1, Brown awarded the contract to T. A. T. and Western Air. Coburn of Aviation assisted Letson in persuading his recalcitrant associate in Avigation to permit Avi-gation to be dissolved. A few months later, Aviation, which had a line reaching to Kansas City, was asked by Brown to accept an extension from Kansas City to Denver and sublet the extension to Letson’s United States Airways.
Henderson’s activities in obtaining the award of the middle route contract to Transcontinental and Western Air could hardly have been limited to the abortive effort of himself and Hinshaw to “get together” with Letson and eliminate his low bid. On October 9, a few days after the award of the contract, Sheaffer of T. A. T. w^rote Henderson as follows:
Now that the smoke has cleared away, and T. A. T. and Western Air Express have been awarded a contract and have set up a new operating company, I have a little breathing spell and I wanted to drop you a note to ex *787 press our appreciation oí your great help in bringing about this- conclusion, which was so important to óur welfare as well as the welfare of the Aviation industry.
I personally greatly value your assistance and cooperation, and any time that I can be of assistance to yoh, I hope you will not hesitate to call on me.
♦ In replying to this letter Henderson said, inter alia:, “If you think that I .have been helpful in the matter of getting this contract squared-away, and I am sure that I have, * * Sheaifer gave no satisfactory explanation, at the hearing, of what he was thanking Henderson for. Henderson likewise gave no satisfactory explanation. He attributed the thanks principally to his intercession with the Comptroller General to approve payment of the bills to Sheaffer’s line for. carrying the mail on the new route. In this Henderson was mistaken, as the carriage of the mails did not even begin until some .time after Sheaifer’s letter was written, and the Comptroller General’s first letter to Brown questioning the legality-, of the contract was written on the same day that Shaelfer wrote to Henderson.
As we have just said, the Comptroller General on October 9 wrote the Postmaster General questioning the propriety of awarding the contract to the high bidder. Brown replied on October 23 pointing out reasons why Avigation did not meet the specifications and was not a responsible bidder. The. Comptroller General replied on December 16, definitely ruling that the night flying requirement was illegal, and asking for an elaboration of reasons why Avigation was not a responsible bidder. At. some time while this question was pending, Brown asked Henderson to intercede with the Comptroller General to get the contract approved. Henderson, who was a personal friend of the Comptroller General, did so. The Comptroller General told Henderson that the whole air mail situation was a mess and that he should get out of the business. He said, however, that ho supposed he would have to approve the contract, which he did by a letter dated January 10,1931.
The May-June conferees may have at the time of the-conference been thinking principally in terms of awards by extension and, where it was desired to give a contract to an operator who did not have a mail contract, or did not have *788 one over an adjacent route, subletting of the extension to him. This process of extension and subletting for this purpose, specifically proposed by plaintiffs’ executive Henderson, who, outside the meeting, expressed the opinion that the scheme went “way and beyond” the intent of the statute, was an evasion of the statute. The agreement of the conferees to accept extensions as requested by Brown and hand them over to his'nominees could, so far as the participants in the conference were concerned, have had no other purpose than to give selected operators the emoluments of air mail contracts without giving competitors, who might be willing to do the work for less, the opportunity to bid. The conferees’ agreement was in this respect in violation of R. S. 3950 and made their air mail contracts liable to annulment. It was an agreement to participate in a process of evasion and pretense to circumvent the well-known purpose and policy of a recently enacted statute, for the purpose of preventing the making of bids for carrying the mail.
The Watres Act provided for extensions and the Postal Laws provided in another place, U. S. C., Tit. 39, Sec. 445, for subletting. Assume that, by a sharp combination of the two devices a public official could lawfully circumvent the spirit and intent of each of the statutory permissions, for the purpose of defeating the legal requirement of competitive bidding. That still would not license the leading figures in the industry, bent on monopolizing the business and main--taining prices, to agree in advance to play their parts, not required by law, to accomplish the desired monopolistic end. They are not clothed with the statutory discretion which we have assumed for the public official, of preventing competitive bidding by sharp maneuvering. Their agreement is a naked agreement to take voluntary steps to prevent competitive bidding. Plaintiffs made such an agreement, and thereby became vulnerable under R. S. 3950.
In addition to the ground just stated we think that the record shows another valid ground for annulment under R. S. 3950. We think that the conference agreement evolved, as the necessity for such an evolution developed, into an understanding that even if the Postmaster General should be required to advertise for bids, still there would be no com *789 petitive bidding by those who had participated in the conference. Aviation, which received the contract on the southern transcontinental route, so understood the arrangement. President Coburn of that company testified before the Senate Committee that he did not fear that any of the companies that had been in the conference would go back on their agreement. The chairman of the committee said “You knew they had agreed not to bid.” Mr. Coburn replied, “There was no formal agreement but there was a general understanding.” After a recess and testimony by Sheaffer of Transcontinental Air Transport denying that his company had made any agreement not to bid, Coburn resumed the stand in the committee hearing and asked for-the privilege of making a statement in correction and explanation of his earlier testimony. In that statement he said:
The feeling in my mind was this: We had never mad© any formal agreements. I think that everybody knew that my company was going to bid on the southern transcontinental and it was common knowledge amongst all of us that T. A. T. and Western Air would bid on the middle one. I am quite sure that I did not fear that the United would come down there and bid for the southern transcontinental, because the Postmaster General had. said that he wanted the three independent competitive lines.
He also said “* * * there were no written agreements, no oral agreements either, in regard to bidding, that is, I did not make any.” But every step in Coburn’s conduct showed that he understood that if he carried out Brown’s directions as to buying out Halliburton and Delta, he need have no fear of the large companies who, in a free market would have been dangerous potential competitors for the southern transcontinental. He followed these directions, advised Brown in effect that the path was clear, bid 100 percent of the maximum, received the ajvard, and, before the contract was let, persuaded Brown to practically double the 100-percent compensation by writing the contract in a higher space bracket than either the anticipated or later realized volume of mail justified. Within a few months he was requested by Brown to accept an extension covering the Kansas City-Denver *790 route for the purpose of subletting it to Letson. He readily Complied.
• As to the middle route, the understanding was the same. Sheaffer’s. report to his executive committee; his violent protest to Holland about the “kind of a fellow” Letson was in proposing to bid for a line that had not been allocated to him; the proprietary attitude of MacCracken, acquiesced in by the Department, in writing specifications for the purpose -of disqualifying Letson; the meticulous care with which the Department picked flaws in Letson’s bid; the prompt reaction ■of Henderson for plaintiffs and Hinshaw for Aviation against Letson’s having submitted a bid; Coburn’s assistance to Letson in having Avigation dissolved with the result that the only competitive bidder who ever appeared throughout Brown’s entire administration was no longer even in existence; Henderson’s intercession with the Comptroller General to have the contract which had been awarded according to the understanding approved; these show how Aviation, Transcontinental and Western Air and its constituent companies, and plaintiffs’ United group regarded the allotment of the air mail business by Brown.
Plaintiffs were not, of course, so active in carrying out the plan as were Aviation'and the-Transcontinental and Western Air combination. Plaintiffs already had a transcontinental route and could not, under Brown’s dictum, interest themselves in another. The heart of the agreement was, of course, that the parties were to have nothing and claim nothing unless it was allotted to them by Brown. But plaintiffs had their rates to protect and maintain, and their future relations with the Postmaster General who had large powers over them. They did, therefore, whatever they were called upon to do to protect the integrity of the agreement. Henderson attempted without success to get Letson to withdraw his troublesome bid. He did enough more before the contract was awarded to elicit a warm letter of thanks from Sheaffer. Thereafter he urged the Comptroller General to approve the contract. Henderson had thought, from the beginning, that Brown’s proposed activities were improper: He might well have dissociated himself and plaintiff companies from them. But to have done that would, he thought, have *791 offended Brown and jeopardized plaintiffs’ rates, so he chose, instead of dissociating himself and plaintiffs from the agreement, to cooperate and have the benefits of that cooperation. Being parties to this combination to prevent competitive bidding, plaintiffs’ contracts became liable to annulment.
We think that for a third reason, closely related to the first, plaintiff Boeing Air Transport, Inc.’s contracts became liable to annulment. Plaintiffs were called upon only once to accept an extension and sublet it to a person designated by Brown, for the purpose of preventing competitive bidding. As appears in Finding 106, Brown, in 1931, being under pressure to establish an air mail line from Omaha to Watertown, South Dakota, requested Boeing Air Transport, Inc., the one of plaintiffs’ group which had the transcontinental line through Omaha, to take this lateral line as an extension. Boeing did not want it, because it was small and unprofitable, and was not required by the law to take it. Several small operators did want it, but Brown was not willing to let them bid for it. So Boeing agreed to take it, to assist Brown in preventing competitive bidding for it, and hold it until Brown should select an operator to whom it would be awarded by sublease, and not by competitive bidding. Brown never fixed upon an operator. In consequence, Boeing, which did not want the line, had it, and the several operators who did want it were prevented from bidding on it.
Taken by itself, this Watertown incident was a violation of R. S. 3950. It was an agreement between Boeing and Brown to prevent competitive bidding. It was also compliance by plaintiffs with the spirit of the agreement made at the conference. It was not within the letter of the conference agreement simply because it involved a route not included among the twelve which Brown submitted to the conference.
We have concluded, as appears from the findings and this opinion, that the evidence before us shows that plaintiffs engaged in three respects in the conduct described in R. S. 3950 as a ground for annulment of a contract to carry mail. It is not, therefore, necessary to decide, and we do not decide, whether plaintiffs could recover if the weight of the evidence before us were to the effect that plaintiffs had not engaged in *792 such conduct but the Postmaster General had, in good faith and upon substantial evidence, concluded that they had done so. We have in this opinion sometimes referred to plaintiffs’ route certificates as contracts. It is not necessary to decide, and we do not decide, to what extent, if at all, these route certificates had the usual legal attributes of ■contracts.
We do not regard the annulment of plaintiffs’ route certificates on February 19, 1984, as having forfeited air mail .pay earned by them before the annulment, even though not paid them at the time of the annulment. Plaintiffs may, therefore, recover the amount of such accrued pay.

The Defendant'1 s Counterclaims

The defendant asserts that it is entitled to recover counterclaims against plaintiffs on five grounds. These grounds appear in Findings 185-139. They are, to some extent, alternative and overlapping rather than separate and independent grounds. Under the first, the defendant claims that plaintiffs’ route certificates were obtained as a result of fraud, collusion, or conspiracy, and that therefore the defendant should recover all that it paid plaintiffs for carrying the mail under the certificates except what plaintiffs have proved the services to be reasonably worth on a quaru-tum meruit theory. Plantiffs have offered no such proof. We do not find that plaintiffs improperly secured their route certificates. The loan of money by Henderson to Gove, of the Department, was highly improper, in view of Henderson’s frequent and important dealings with the Department. There is, however, no evidence that plaintiffs were aware of or reimbursed Henderson for the money advanced to Gove, or that Henderson was motivated by any reason except personal friendship for Gove. We do not find that plaintiffs •obtained anything from the Department by reason of Henderson’s dealing with Gove. Nor do we find that plaintiffs’ installation of the radio set in Brown’s office was for any reason other than to assist Brown in securing the favorable ■interest of Congressmen and others in the air mail.
The defendant also asserts, under its first ground of counterclaim, that if, as we have found, plaintiffs violated R. S. *793 3950, relating to combinations in restraint of bidding, the defendant is entitled to recover back all moneys paid plaintiffs in excess of the reasonable value of plaintiffs’ services. This might well be the result of a violation of it. S. 3950 in some cases. If the one against whom the Government asserted the claim had been the contractor who was awarded the contract concerning which competitive bidding was suppressed, so that it profited directly from the suppression, the relation of cause and effect between the tort and the payments received under the contract might well be such as to produce such a result. Here, however, two of plaintiffs’ five route certificates were awarded before the May 19-June 4 conferences and one during the conference and before it had reached its conclusions. As to the other two, the important New York-Chicago and Chicago-San Francisco routes, the certificates were issued on October 21 and 22, 1930. Plaintiffs were entitled to the certificates under the statute if the Postmaster General was willing to award them. We have little doubt, however, that if a low competitive bidder, such as Avigation, had secured the contract on the adjoining middle transcontinental route, plaintiffs’ rates under its certificates would have had to be set substantially lower than they were to avoid odious comparisons. This was the idea expressed by Henderson in his letter of June 26 to his superior, Johnson, quoted in this opinion. In these circumstances, plaintiffs could hardly complain if they were treated as beneficiaries of the wrongful combination, who should disgorge the benefits and receive instead the reasonable value of their services. We do not know, however, what would have been the award on the middle route, nor at what rate, if it had been open to real competitive bidding. On the whole we have concluded that plaintiffs are not liable under the defendant’s first ground of counterclaim.
The defendant’s second ground of counterclaim is that plaintiffs were overpaid in many cases because, under the route certificates, they were paid more than 40 cents per mile for a reserved space for air mail of 25 cubic feet or less, whereas Section 4 of the statute set 40 cents as a maximum for such an amount of space. We think, however, that Section 6 of the act permitted the Postmaster General to pay a *794 per mile rate up to $1.25 on a route certificate! regardless of the amount of space reserved, even though 40 cents was set by Section 4 as the maximum under a contract. Since plaintiffs were not paid more than $1.25 a mile, the defendant rnay not recover on this ground.
The third ground of counterclaim is that on many of plaintiffs’ runs space in excess of twenty-five cubic feet was reserved and paid for, though' on most actual flights on these runs less than twenty-five cubic feet of space was used. The Department had a regulation that if a certain space was reserved and the actual mail exceeded the space.on more than half the trips during a month, the next’ higher space unit would be called for thereafter and paid for. The regulation did not call for a corresponding reduction in case the space reserved was not fully used. These were the defendant’s regulations, and even if they were improvident and resulted in overpayments it does not appear that they were the result of collusion between plaintiffs and the Department. We deny this ground of counterclaim, as we do also the next one which seeks a refund for unused space for the reason that throughout the period of these route certificates only some 40 percent of the space reserved and paid for was actually used. But plaintiffs were paid for furnishing the space, which they did, and for carrying whatever mail was given to them to carry, which they did.
The defendant’s final ground of counterclaim is that the consolidation of Route A. M. 32, which had a contract rate of 9 cents per pound, with A. M. 5, which had a contract rate of $3 per pound, resulted in the payment of a higher rate, not, however, $3 per pound, for the consolidated route, which constituted' an overpayment. The Watres Act, approved April 29, 1930, removed the prohibition against paying a higher rate under a route certificate than the rate set in the contract superseded by the certificate. On May 3, the Postmaster General awarded a route certificate in exchange for the contract on Route 5. On May 27, he consolidated the two lines. The rates paid after -the consolidation were not substantially different from those paid on plaintiffs’ other lines. This ground of counterclaim is not well founded.
*795 We conclude (-1) that there were valid grounds for the annulment of plaintiffs’ route certificates, and that the several annulments did not constitute breaches of contract; (2) the plaintiffs are entitled to the pay accrued before the annulments ; (3) that the defendant is not entitled to recover on its counterclaims.
It is so ordered.
Whaley, Chief Justice, concurs.
Whitakee, Judge, took no part in decision of this case.